UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ERIN BINFORD,<br><br>      Plaintiff,<br><br> -against-<br><br>STARBUCKS CORPORATION,<br><br>      Defendant. | Civil Action No.:<br><br>**COMPLAINT**<br><br>Jury Trial Demanded |

Plaintiff, Erin Binford ("Plaintiff"), by and through her attorneys, FJ Law, hereby complains about Defendant Starbucks Corporation ("Starbucks", the "Store", or "Defendant") as follows:

**PRELIMINARY STATEMENT**

1. This is an action seeking remedies for, among other things, disability discrimination, failure to engage in the interactive process, and retaliation which culminated in the wrongful termination of Plaintiff's employment after faithfully serving Defendant for nearly seventeen (17) years.

2. Despite her long tenure with Defendant, Plaintiff faced swift discrimination and retaliation beginning in and or around February 2024, after she contracted COVID-19.

3. On the morning of February 26, 2024, Plaintiff began experiencing COVID-19 symptoms during her commute to work. Importantly, Plaintiff's husband had tested positive for COVID-19 the night before.

4. When she disclosed her symptoms and suspected illness to her manager Cecilia Carson ("Carson"), Plaintiff's complaints were ignored and/or downplayed and Plaintiff was

1

forced to report to the training floor.  Although unwell and concerned for her colleagues, Plaintiff feared retaliation and turned to her work.

5.     A short time later, Carson summoned Plaintiff to the backroom of the store after she "discovered" that Plaintiff had failed a Starbucks required symptom check. Despite this fact, and Plaintiff's express confirmation that she was unwell and her pleas for guidance on Defendant's COVID-19 sick leave, Carson nevertheless attempted to manipulate Plaintiff into believing that she was not experiencing COVID-19 symptoms. Still, Carson ultimately sent Plaintiff home.

6.     Unfortunately, Defendant's unlawful conduct continued the following morning after Plaintiff informed the shift supervisor, Shannon O'Keefe ("O'Keefe"), of her positive COVID-19 test.  In response, Carson and O'Keefe directed Plaintiff to seek out information and guidance on Defendant's testing and return to work requirements, rather than provide the information to her.  This illegal interference, discrimination, and retaliation and continued refusal to engage in a cooperative dialogue.

7.     What is worse, when Plaintiff returned to work after her required COVID leave period, she discovered her hours had been significantly reduced, which also adversely impacted her eligibility for healthcare coverage. This constitutes continued and further discrimination and retaliation.

8.     Ultimately, Defendant's discrimination and retaliation reached its zenith when, on March 12, 2024, Defendant terminated Plaintiff's employment for the pretextual and astonishing reason that she violated Defendant's COVID-19 protocol.

9.     In a final, cruel act of retaliation, Carson hovered over Plaintiff while she gathered her belongings and then walked her out of the store, all of which was intended to and did cause further embarrassment and humiliation.

10. Briefly stated, Defendant terminated Plaintiff's employment after she contracted COVID-19. Plaintiff was unable to work and required brief sick leave. Shortly after she requested time off for her symptoms, and to protect her co-workers and the public who came into the Store, she was fired.

11. Plaintiff complains pursuant to the New York State Human Rights Law, NYS Executive Law §§ 296 et seq. ("NYSHRL"), and the New York Labor Law ("NYLL") among other laws as set forth below.

## PARTIES

12. Plaintiff is an individual who, at all relevant times, resides in Dutchess County, State of New York.

13. Upon information and belief, Defendant Starbucks is a foreign corporation duly authorized to conduct business in the state of New York, and is headquartered at 2401 Utah Avenue South, Suite 800, Seattle, WA, 98134.

14. At all relevant times, Defendant was an "Employer" and supervisor of Plaintiff, including, but not limited to, the definition of the term under all relevant statutes.

15. At all relevant times, Plaintiff was an "employee" and/or "covered employee" of Defendant under all relevant statutes, including, but not limited to, the definition of the term under the NYSHRL and NYLL.

## JURISDICTION AND VENUE

16. The Court has jurisdiction over the subject matter of the action pursuant to 28 U.S.C. §§ 1332 as Defendant and Plaintiffs are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interests and costs.

17. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff resides within the jurisdiction of this District, and Defendant transacts business within and otherwise has sufficient contacts with this District to subject it to personal jurisdiction at the time this action is commenced. Further, a substantial part of the events and/or omissions giving rise to this action occurred in this district.

## STATEMENT OF FACTS

18. Plaintiff began her employment with Starbucks on or around March 7, 2007, as a barista, at one of Defendant's stores located in Las Vegas, Nevada. In the time since, Plaintiff has worked at several stores, most recently at the 712 Dutchess Turnpike store in Poughkeepsie, NY.

19. Throughout her employment, Plaintiff dedicated herself to Starbucks, working long hours and meeting Starbucks's expectations.

20. Notably, an opening shift required Plaintiff to arrive at Starbucks around approximately 4:30am to prepare and/or bake products for the day. On most occasions, Plaintiff was the first employee to arrive to prepare the store to open for the day.

21. As a result of her hard work and dedication, Plaintiff received numerous promotions throughout the course of her tenure at Starbucks, and in 2012 was promoted to assistant manager and then to store manager in 2013. In fact, Plaintiff was recognized as "Partner of the Quarter" in early 2024, just months before her swift and unlawful termination.

22. Following the onset of the COVID-19 pandemic, Plaintiff grew increasingly concerned about the safety of her employees due to the Defendant's lack of formal guidance relative to employees who had or were suspected of contracting COVID-19.

23. As the pandemic wore on, Plaintiff's concerns over managing the staff and the uncertainties of COVID-19 were overwhelming and she requested to step down as store manager

4

and to decrease her hours to focus on her mental health. Accordingly, in or around July 2021, Plaintiff stepped down from her position as store manager and began working as a shift supervisor.

24. In order to remain eligible for health benefits, Starbucks employees must work a minimum of twenty-five (25) hours per week. Consequently, upon decreasing her job duties and hours, Plaintiff explicitly requested that she placed on the weekly schedule to work a minimum of twenty-five (25) hours per week.

### *Defendant Hired a New Store Manager and Employees Were Soon Denied Breaks and Discouraged from Using Legally Protected Sick Time*

25. Shortly after Plaintiff stepped down, Defendant hired Cecilia Carson ("Carson") as the new Store Manager.

26. Almost from the outset of her tenure, Carson exhibited concerning behaviors like denying employees legally required breaks (during long shifts) or simple meal breaks. Similarly, Carson callously ignored messages from employees about staffing issues or when employees were sick.

27. Most concerningly however, Carson provided almost no guidance regarding COVID-19 protocols to be followed in the event of actual or suspected COVID-19 infection. In fact, on numerous occasions when employees informed Carson that they felt unwell or called out sick, she responded with negative comments, such that employees were scared to call out sick in the future.

28. Several times Plaintiff brought these issues to Carson's attention verbally or by text message. Unfortunately, Carson disregarded or flatly ignored Plaintiff's complaints.

29. By way of example, in or around September 2023, an employee called out of work during Plaintiff's shift. This unexpected call out left the store short-staffed, making it impossible for the workers to take legally required breaks, including Plaintiff.

30. Plaintiff sent Carson a text message informing her of the restaurant's staffing issues and expressed her concerns about the employees taking required breaks and also managing the store's demands. Unfortunately, Carson never responded and Plaintiff and the other employees were given no guidance on how to manage legally required breaks.

### *Plaintiff Complained of COVID-19 Symptoms and Sought Accommodation*

31. On or about February 25, 2024, Ms. Binford's husband tested positive for a COVID-19 infection.

32. On the morning of February 26, 2024, Plaintiff left for work as usual. Unfortunately, during her commute, she began experiencing symptoms such as congested sinuses and a sore throat.

33. When she arrived at the store, Plaintiff completed Starbucks' symptom check, which required all store employees to document symptoms before clocking in at the start of a shift. Plaintiff then spoke with Carson and sought guidance on Starbucks' policy relative to employees with a suspected COVID-19 infection and what procedures she should follow.

34. Plaintiff advised Carson of her symptoms as well as the fact that her husband had tested positive for COVID-19 the night prior, underscoring her belief that she likely had COVID-19 as well.

35. However, before she could even finish her statement, Carson interjected and stated *"it's just allergies, I have them too"*, or words to this effect. Then Carson callously directed Plaintiff **"you have training to do - do the training and get on the floor"**.

36. Approximately an hour after this discussion, Carson approached Plaintiff and directed her to the back of the store. Upon entry, Carson informed Plaintiff that she did not pass

6

the symptom check and began reading off the symptoms in a manner that strongly suggested Plaintiff was lying.

37. Plaintiff reminded Carson of the earlier conversation, when Plaintiff first arrived. Bizarrely, Carson then declared **"w*ell I am shocked that you insisted on working when you are sick"***, or words to this effect.

38. Baffled by Carson's behavior, Plaintiff asked what she should do, suggesting it was best if she leave, to which Carson coldly waved her away.

39. Still, Carson did not provide Plaintiff with any guidance on any of Starbucks' protocols, sick leave options, or any steps she should take to return to work but Plaintiff advised Carson she would get tested immediately.

40. Upon leaving the store, Plaintiff went to the closest urgent care to get tested. Not surprisingly, she tested positive for COVID-19.

41. The following day, Carson left for a previously scheduled vacation. Still, Plaintiff called Carson numerous times, both to inform her that she had tested positive for COVID-19, and to obtain clarity on how long she needed to remain out of work and the testing required to return to work. Unfortunately, her calls went straight to voicemail and were not returned.

42. Accordingly, Plaintiff then reached out to the temporary manager Shannon O'Keefe ("O'Keefe") to obtain instructions, and to inform her of her positive COVID-19 infection.

43. O'Keefe responded to Plaintiff's text message and relayed a message from Carson that Starbucks required Plaintiff to reach out to her directly, notwithstanding the fact that she was on vacation. Strangely, this message also ignored the fact that Plaintiff has already done so, but Carson did not respond.

44. It was becoming increasingly clear neither O'Keefe nor Carson had any intention of engaging in a cooperative or responsible dialogue with Plaintiff. Indeed, Carson deliberately ignored her calls, deliberately obstructing Plaintiff's effort to seek accommodation and guidance on the Store's COVID-19 policies, all in violation of Defendant's legal obligation to engage in the interactive process.

45. O'Keefe dismissed Plaintiff with words to the effect of ***"let me know if you need anything else!"*** but failed to address Plaintiff's complaints and offered no assistance.

46. Later, Plaintiff contacted Starbucks' Human Resources Department, who informed her that following a positive test, employees were not permitted to work for a minimum of five (5) days, and that following the five-day period they could return to work only after they had been symptom free for more than twenty-four hours.

47. Accordingly, following the instructions from the Human Resources Department Plaintiff returned to work on March 4, 2024.

### ***Plaintiff Returns to Work After Recovering from COVID-19 and Faces Immediate Retaliation***

48. During the week following her return to work, Carson mostly ignored Plaintiff.

49. What is worse, Plaintiff discovered that her hours had been cut significantly. In fact, the reduction was so significant it impacted her eligibility for health insurance, something Plaintiff had expressly discussed with Carson on numerous occasions.

50. Still, Plaintiff continued to perform her job, all the while hoping the circumstances would improve and her hours would come back. Sadly, hope was not enough.

### ***Plaintiff's Employment is Pretextually Terminated.***

51. On March 12, 2024, Defendant punctuated its discriminatory and retaliatory scheme by pretextually terminating Plaintiff's employment.

52. When she arrived for work, Plaintiff was summoned to the backroom again by Carson.

53. When she arrived, Carson and another unknown manager, Melanie Hunt ("Hunt"), awaited her. Without preamble, Carson coldly informed Plaintiff that her employment was terminated, effective immediately, for "breaking Starbucks policy" for coming to the store while sick.

54. Carson handed Plaintiff a "Notice of Separation", dated March 12, 2024, which read in part:

> ***On 02/26/2024 Erin came into work and did not pass the Partner Symptom check and did not follow the instructions on the tool immediately clock out and notify the play caller so the play caller can inform the store manager. Erin then began work and worked partners and customers for 2 hours until the store manager became aware that Erin did not pass the symptom check. Erin was immediately sent home.***

55. Tellingly, this notice is signed by Carson.

56. Plaintiff was stunned, but attempted, in vain, to remind Carson that she did advise her of her symptoms and expressly sought guidance. Carson vehemently denied these facts and refused to let Plaintiff speak any further.

57. In fact, Carson's behavior was so discourteous, Hunt was forced to intercede and advise Carson to let Plaintiff speak. Still, Plaintiff was thereafter directed to leave.

58. In one last callous and retaliatory act, Carson insisted that she supervise Plaintiff's efforts to gather her belongings and then she escorted Plaintiff out of the store, clearly intending to further her humiliation and embarrassment.

59. Sadly, Plaintiff was maliciously terminated by Defendant, despite nearly seventeen (17) years of dedicated service, and solely because of her COVID-19 infection and her request for accommodation.

60. The above illustrated just some of the harassment, retaliation, abuse and inferior terms and conditions of employment Plaintiff was forced to endure.

61. Defendant's actions were intended to, and did, discriminate and retaliate against Plaintiff for her disability. When Plaintiff complained, she was met with a swift, pretextual termination.

62. As result of Defendant's actions, Plaintiff felt extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

63. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of a salary, bonuses, benefits and other compensation which such employment entails.

64. Further, due to Defendant's conduct Plaintiff has and continues to suffer emotional harm, anxiety, stress, loss of sleep, loss of appetite and pain and anguish.

65. As Defendant's conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands punitive damages.

**AS A FIRST CAUSE OF ACTION AGAINST DEFENDANT**
**<u>DISCRIMINATION UNDER THE NYSHRL</u>**

66. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

67. New York State Executive Law § 296 provides:

> "It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, citizenship or immigration status, sexual

orientation, gender identity or expression, military status, sex, *disability*, predisposing genetic characteristics, familial status, marital status or status as a victim of domestic violence, of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment." (emphasis added).

68. Further, New York State Executive Law § 296 prohibits an employer from denying reasonable accommodation.

69. Defendant violated the section cited herein by creating and maintaining discriminatory working conditions, a hostile work environment, failing to engage in an interactive process and to provide reasonable accommodations, and otherwise discriminating and engaging in disparate treatment against Plaintiff because of her disability.

70. Defendant discriminated against Plaintiff on the basis of her disability and/or perceived disability in violation of the NYSHRL by denying her equal terms and conditions of employment, including, but not limited to, denying her the opportunity to work in an employment setting free of unlawful discrimination, denying or taking away her job responsibilities and advancement opportunities and ultimately terminating her employment.

71. As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, and severe mental anguish and emotional distress, for which she is entitled to an award of monetary damages, in addition to attorneys' fees and costs, and other relief, to the greatest extent permitted under law.

## AS A SECOND CAUSE OF ACTION AGAINST DEFENDANT
### RETALIATION UNDER THE NYSHRL

72. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

11

73. New York State Executive Law § 296 (7) provides that it shall be an unlawful discriminatory practice: "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he has opposed any practices forbidden under this article."

74. Plaintiff engaged in protected activities by requesting reasonable accommodation and seeking leave protected under the law.

75. In response, Defendant subjected Plaintiff to adverse employment actions, including but not limited to, ignoring her request for accommodation, reducing her hours, and ultimately terminating her employment.

76. As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, and severe mental anguish and emotional distress, for which she is entitled to an award of monetary damages, in addition to attorneys' fees and costs, and other relief, to the greatest extent permitted under law.

### AS A THIRD CAUSE OF ACTION AGAINST DEFENDANT
### RETALIATION IN VIOLATION OF NYLL § 215

77. NYLL § 215(1)(a) provides, in pertinent part:

> No employer or his or her agent, or the officer or agent of any corporation, partnership, or limited liability company, or any other person, shall discharge, threaten, penalize, or in any other manner discriminate or retaliate against any employee (i) because such employee has made a complaint…that the employer has engaged in conduct that the employee, reasonably and in good faith, believes violates any provision of this chapter…or **(vi) because such employee has otherwise exercised rights protected under this chapter…or (viii) because such employee has used any legally protected absence pursuant to federal, local, or state law**. (Emphasis added).

78. Plaintiff utilized protected absences pursuant to the law, which is a protected activity under the law.

79. Defendant retaliated against Plaintiff due to her protected activities by reducing her hours, and ultimately terminating her employment. As such, Defendant has violated this section of the NYLL.

80. Plaintiff is entitled to all appropriate relief, including but not limited to, lost compensation, back pay, front pay, liquidated damages, compensatory damages, pain and suffering, costs and attorneys' fees.

## JURY DEMAND

81. Plaintiff requests a jury trial on all issues to be tried.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests a judgment against Defendant as follows:

A. Declaring that the Defendant engaged in unlawful employment practices prohibited by the NYSHRL and the New York Labor Law, in that the Defendant harassed, discriminated, and retaliated against Plaintiff on the basis of her disability;

B. An injunction and order permanently restraining Defendant from engaging in such unlawful conduct;

C. Awarding damages to the Plaintiff for any lost wages and benefits, past and future, back pay and front pay, and interest, resulting from Defendant's unlawful employment practices;

D. Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to reputation in an amount in excess of the jurisdiction of all lower courts;

  E. Awarding Plaintiff all damages sustained as a direct and proximate result of Defendant's unlawful conduct alleged herein;

  F. Awarding Plaintiff civil penalties and liquidated damages.

  G. Awarding Plaintiff Punitive Damages;

  H. Awarding Plaintiff all interest, attorney's fees, costs, disbursements and expenses incurred in the prosecution of the action; and

  I. Awarding Plaintiff such other and further relief as the Court may deem equitable. just and proper.

Dated: February 18, 2026
   Purchase, New York

                Yours, etc.,

                FJ LAW

                By: _____
                 Joseph Jeziorkowski, Esq.
                 Daniel Folchetti, Esq.
                *Attorneys for Plaintiff*
                *Erin Binford*
                2975 Westchester Ave., Suite 418
                Purchase, NY 10577
                (914) 730-2422
                joe@fjlglaw.com
                dfolchetti@fjlglaw.com